## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| XIAOXIAN DAI, derivatively on behalf of TESARO, INC., | |
| Plaintiff, | Case No.: |
| vs. | |
| LEON O. MOULDER JR., TIMOTHY R. PEARSON, MARY LYNNE HEDLEY, LAWRENCE M. ALLEVA, JAMES O. ARMITAGE, EARL M. COLLIER, JR., DAVID M. MOTT, GARRY A. NICHOLSON, ARNOLD L. ORONSKY, KAVITA PATEL, and BETH SEIDENBERG, | |
| Defendants, | |
| and | |
| TESARO, INC., | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Xiaoxian Dai ("Plaintiff" or "Dai"), by Dai's undersigned attorneys, derivatively and on behalf of Nominal Defendant TESARO, Inc. ("TESARO" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Leon O. Moulder Jr., Timothy R. Pearson, Mary Lynne Hedley, Lawrence M. Alleva, James O. Armitage, Earl M. Collier, Jr., David M. Mott, Garry A. Nicholson, Arnold L. Oronsky, Kavita Patel, and Beth Seidenberg (collectively, the "Individual Defendants" and together with TESARO, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of TESARO, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange

Act of 1934 (the "Exchange Act"). As for Dai's complaint against the Individual Defendants, Dai alleges the following based upon personal knowledge as to Dai and Dai's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Dai's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding TESARO, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by TESARO's directors and officers from March 14, 2016 through the present (the "Relevant Period").

2.      TESARO is a commercial-stage biopharmaceutical company focused on providing innovative therapies for cancer patients.

3.      TESARO's product portfolio includes, and included at all relevant times, VARUBI (rolapitant), which is a neurokinin-1 ("NK-1") receptor antagonist for the prevention of chemotherapy induced nausea and vomiting ("CINV").

4.      The Food and Drug Administration ("FDA") approved VARUBI's oral formulation in September 2015, and an intravenous ("IV") formulation of VARUBI ("VARUBI IV") on October 25, 2017.

5.      On January 12, 2018, shortly after the FDA approved VARUBI IV, the Company announced that it had updated the U.S. package insert for VARUBI IV following reports of

"[a]naphalyaxis, anaphylactic shock and other serious hypersensitivity reactions." The Company also issued a Dear Healthcare Professional letter to communicate the dangers of these hypersensitivity reactions to the medical practitioner community.

6.      On this news, the price per share of TESARO stock declined from a close of $69.59 on January 12, 2018 to close at $65.52 on January 16, 2018 -- a drop of 5.8%, or $4.07 per share.

7.      On February 27, 2018, TESARO issued a press release that revealed that the Company would "suspend distribution of VARUBI IV" as a result of the adverse reaction reports.

8.      On February 28, 2018, before markets closed, the Company filed with the SEC its annual financial report on Form 10-K, which further discussed the impact of the adverse drug reactions on the Company's financial health and business strategy. Indeed, the Company admitted it was evaluating its options with respect to VARUBI, including out-licensing.

9.      On this news, price per share of TESARO stock fell from a close of $61.55 per share on February 27, 2018 to close at $55.23 per share on February 28, 2018 -- a drop of 10.3%, or $6.32.

10.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to overproduce VARUBI, ultimately leading the Company to write-down $16.7 million as a cost of product sales due to excess and obsolete VARUBI inventory and  an additional $2 million based on its conclusion that a significant portion of the Company's VARUBI inventory was unlikely to be utilized in future product sales prior to expiration, resulting in an aggregate write-down of $18.7 million for the fiscal year ended December 31, 2017 (the "Waste Misconduct").

12.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to TESARO, willfully or recklessly made and/or caused the Company to make false and/or misleading statements.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) substantial health risks were associated with VARUBI IV, including anaphylaxis and anaphylactic shock; (2) as a result of the foregoing, the Company would be forced to cease marketing and distribution of VARUBI IV, need to pursue strategic alternatives for the VARUBI brand, and would be forced to write down $18.7 million of VARUBI that the Company was unable to sell; (3) the Company engaged in the Waste Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, TESARO's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13.     TESARO's directors further breached their fiduciary duties by improperly awarding themselves excessive compensation, thereby wasting corporate assets.  In fact, each of the non-employee director-defendants received over $1 million in compensation in 2017 from the Company, which amount greatly exceeds the average total director compensation for a Fortune 100 company and S&P 500 company.

14.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

15.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, three of Individual Defendants engaged in lucrative insider sales, netting proceeds of over $2.1 million.

16.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales, and is costing the Company millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the directors having caused the Company to pay them excessive compensation, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because TESARO is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of TESARO. Plaintiff has continuously held TESARO common stock at all relevant times.

### Nominal Defendant TESARO

24.     TESARO is a Delaware corporation with its principal executive offices at 1000 Winter Street, Suite 3300, Waltham, MA 02451. TESARO's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "TSRO."

### Defendant Moulder

25.     Defendant Leon O. Moulder, Jr. ("Moulder") has served as the Company's CEO and member of the Board of Directors since co-founding TESARO in 2010. According to the Company's Schedule 14A filed with the SEC on April 7, 2017 (the "2017 Proxy Statement"), as of March 31, 2017, Defendant Moulder beneficially owned 2,112,211 shares of the Company's

common stock, which represented 3.8% of the Company's outstanding stock as of that date.[1] Given

that the price per share of the Company's common stock at the close of trading on March 31, 2017

was $153.87, Moulder owned over $325 million worth of TESARO stock.

26.     For the fiscal year ended December 31, 2017, Defendant Moulder received

$6,043,422 in compensation from the Company. This included $659,615 in salary, $2,387,730 in

stock awards, $2,582,790 in option awards, $406,560 in non-equity incentive plan compensation,

and $6,727 in all other compensation.

27.     The Company's Schedule 14A filed with the SEC on April 6, 2018 (the "2018

Proxy Statement") stated the following about Defendant Moulder:

> *Leon (Lonnie) O. Moulder, Jr.*[2] has served as Chief Executive Officer and as a
> member of our board of directors since co-founding the Company in March 2010.
> From April 2009 to January 2010, Mr. Moulder served as vice chairman of the
> board of directors and president and chief executive officer of Abraxis
> BioScience, Inc., a biotechnology company. Before that, Mr. Moulder served as
> vice chairman of Eisai Corporation of North America, from January 2008 until
> January 2009, following Eisai Co. Ltd.'s acquisition of MGI PHARMA, Inc., a
> pharmaceutical company, in January 2008. Mr. Moulder served as president and
> chief executive officer and as a member of the board of directors of MGI
> PHARMA, Inc. from May 2003 through January 2008. Mr. Moulder joined MGI
> PHARMA, Inc. in September 1999 as executive vice president and was promoted
> to president and chief operating officer in May 2002. Mr. Moulder earned a
> bachelor of science degree in pharmacy from Temple University and a master of
> business administration degree from the University of Chicago. Mr. Moulder
> currently serves as chairman of the board of directors of Trevena, Inc. (NASDAQ:
> TRVN), as a trustee of Temple University, and is on the board of the Fox Chase
> Cancer Center. Mr. Moulder also served as a director of Cubist
> Pharmaceuticals, Inc. through the sale of the company to Merck & Co., Inc. in
> 2015. The board of directors believes Mr. Moulder's perspective and experience as
> our co-founder and Chief Executive Officer, his depth of operating and senior
> management experience in our industry and his experience serving on the boards
> of directors of public and private companies in the life sciences industry provide
> him with the qualifications and skills to serve as a director.

---

[1] Includes 1,093,283 shares of common stock subject to outstanding options that were exercisable
within 60 days of March 31, 2017.
[2] Emphasis is in the original unless otherwise noted throughout this Complaint.

**Defendant Pearson**

28.     Defendant Timothy R. Pearson ("Pearson") has served as the Company's CFO since 2014 and as the Company's interim principal accounting officer since November 27, 2017. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Pearson beneficially owned 137,125 shares of the Company's common stock.[3] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Pearson owned approximately $21.1 million worth of TESARO stock.

29.     For the fiscal year ended December 31, 2017, Defendant Pearson received $2,971,593 in compensation from the Company. This included $419,660 in salary, $1,061,173 in stock awards, $1,147,883 in option awards, $191,940 in non-equity incentive plan compensation, and $150,937 in all other compensation.

30.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Pearson made no purchases of Company stock, and sold 1,447 shares of Company stock on March 2, 2017, from which he benefited in the amount of approximately $257,001. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

31.     The Company's 2018 Proxy Statement stated the following about Defendant Pearson:

> *Timothy R. Pearson* (50) has served as Executive Vice President and Chief Financial Officer since May 2014. Prior to joining us, Mr. Pearson served as Chief Financial Officer, Executive Vice President and Treasurer of Catalyst Health Solutions, Inc., a publicly held pharmacy benefit manager, from August 2011 until

---

[3] Includes 134,197 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017

Catalyst was acquired by SXC Health Solutions (now Catamaran Corporation) in July 2012. Prior to joining Catalyst, Mr. Pearson served as Chief Financial Officer and Executive Vice President of MedImmune, the global biologics business for AstraZeneca plc. Mr. Pearson, a Certified Public Accountant, holds dual B.S. degrees from the University of Delaware (in business administration) and the University of Maryland University College (in accounting), as well as an M.S. in Finance from Loyola University. Mr. Pearson serves on the board of directors of GlycoMimetics, Inc. (NASDAQ: GLYC) and RA Pharmaceuticals, Inc. (NASDAQ: RARX).

**Defendant Hedley**

32.     Defendant Mary Lynne Hedley ("Hedley") has served as the Company's President and member of the Board of Directors since co-founding TESARO in 2010. She has also served as the Company's Chief Operating Officer ("COO") since 2014. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Hedley beneficially owned 1,544,991 shares of the Company's common stock, representing 2.8% of the Company's outstanding stock as of that date.[4] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Hedley owned over $237.7 million worth of TESARO stock.

33.     For the fiscal year ended December 31, 2017, Defendant Hedley received $5,119,320 in compensation from the Company. This included $609,519 in salary, $1,989,745 in stock awards, $2,152,254 in option awards, $353,678 in non-equity incentive plan compensation, and $14,124 in all other compensation.

34.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Hedley made no

---

[4] Includes 6,073 shares of common stock held directly by Dr. Hedley, 563,569 shares of common stock held directly by trusts of which Dr. Hedley is a trustee or co-trustee, with respect to which Dr. Hedley disclaims beneficial ownership except to the extent of her pecuniary interest therein, if any, and 975,349 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017

purchases of Company stock, and sold 3,927 shares of Company stock on March 2, 2017, from which she benefited in the amount of approximately $697,474. Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

35.     The Company's 2018 Proxy Statement stated the following about Defendant Hedley:

> *Mary Lynne Hedley, Ph.D.* has served as our President and as a member of our board of directors since co-founding the Company in March 2010. She also served in the role of Chief Scientific Officer from the Company's founding until she became Chief Operating Officer in July 2014. From July 2009 to February 2010, Dr. Hedley served as executive vice president of operations and chief scientific officer of Abraxis BioScience, Inc. Dr. Hedley served as executive vice president of Eisai Corporation of North America from January 2008 until July 2009, following Eisai Co. Ltd.'s acquisition of MGI PHARMA, Inc. in January 2008. Dr. Hedley served in various positions at MGI PHARMA, Inc. from 2004 through its acquisition in January 2008, most recently as executive vice president and chief scientific officer. Prior to that, Dr. Hedley co-founded and served as the president and chief executive officer of ZYCOS, Inc., a biotechnology company, which was acquired by MGI PHARMA, Inc. in 2004. Before co-founding ZYCOS, Dr. Hedley completed two consecutive postdoctoral fellowships at Harvard University. Dr. Hedley earned a bachelor of science degree in microbiology from Purdue University and a doctoral degree in immunology from the University of Texas, Southwestern Medical Center. Dr. Hedley currently serves on the boards of directors of bluebird bio, Inc. (NASDAQ: BLUE), Millendo Therapeutics, Inc. and Youville Place, Inc. She also served on the board of directors of Receptos, Inc. prior to its acquisition by Celgene Corp. in August 2015. The board of directors believes Dr. Hedley's perspective and experience as our co-founder and President, her educational background and her operating and management experience in the life sciences industry provide her with the qualifications and skills to serve as a director.

**Defendant Alleva**

36.     Defendant Lawrence M. Alleva ("Alleva") has served as a Company director since 2012 and is Chair of the Audit Committee. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Alleva beneficially owned 98,404 shares of the Company's common stock.[5]

---

[5] Includes 70,570 shares of common stock subject to outstanding options that were exercisable

Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Alleva owned over $15.1 million worth of TESARO stock.

37.     For the fiscal year ended December 31, 2017, Defendant Alleva received $1,065,526 in compensation from the Company, comprised of $70,000 in fees earned or paid in cash, and $995,526 in option awards.[6]

38.     The Company's 2018 Proxy Statement stated the following about Defendant Alleva:

> *Lawrence M. Alleva* has served on our board of directors since March 2012. Mr. Alleva is currently retired. Prior to his retirement in June 2010, Mr. Alleva was employed by PricewaterhouseCoopers LLP ("PwC"), for 39 years, including 28 years as a partner with the firm. Mr. Alleva served clients primarily in the technology sector, including pharmaceutical and biotechnology companies. Additionally, he served in a variety of office and regional practice leadership roles, most recently as ethics and compliance leader (assurance) for PwC from 2006 until his retirement. Mr. Alleva is a Certified Public Accountant (inactive). Mr. Alleva received a bachelor of science degree in accounting from Ithaca College and attended the Columbia University Executive MBA (non-degree) Program. Mr. Alleva also serves as a director for Adaptimmune Therapeutics plc (NASDAQ: ADAP), Bright Horizons Family Solutions Inc. (NYSE: BFAM) and Mersana Therapeutics (NASDAQ: MRSN). Mr. Alleva also served as a director of Mirna Therapeutics, Inc. (now known as Synlogic, Inc.) from July 2014 to August 2017. The board of directors believes Mr. Alleva's extensive experience and expertise working with public companies on corporate finance and accounting matters as a Certified Public Accountant (inactive), his experience serving on other corporate boards, and his experience in a senior leadership role at PwC provide him with the qualifications and skills to serve as a director.

**Defendant Armitage**

---

within 60 days of March 31, 2017.

[6] Each non-employee director was granted an option to purchase 12,000 shares of the Company's common stock at an exercise price of $149.22 per share, which vests on the earlier of the one-year anniversary of the grant date and the date of the Company's next annual meeting, subject to continued service on our board. The $995,526 figure does not reflect compensation actually received by the director but represents the aggregate full grant date fair value of stock option awards granted to the director and calculated by the Company in accordance with Accounting Standards Codification Topic 718, Compensation—Stock-Based Compensation ("ASC 718"), disregarding adjustments for forfeiture assumptions.

39.    Defendant James O. Armitage, M.D. ("Armitage") has served as a Company director since 2013. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Armitage beneficially owned 58,500 shares of the Company's common stock.[7] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Armitage owned over $9 million worth of TESARO stock.

40.    For the fiscal year ended December 31, 2017, Defendant Armitage received $1,053,026 in compensation from the Company, comprised of $57,500 in fees earned or paid in cash, and $995,526 in option awards.

41.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Armitage sold 10,000 shares of Company stock on September 18, 2017, from which he benefited in the amount of approximately $1.2 million and made no purchases of Company stock. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

42.    The Company's 2018 Proxy Statement stated the following about Defendant Armitage:

> *James O. Armitage, M.D.* has served on our board of directors since May 2013. Dr. Armitage has been a professor of internal medicine in the division of hematology and oncology at the University of Nebraska Medical Center since 2003, after having served as chairman of the department of internal medicine, dean of the college of medicine, and in various other capacities since joining the Center in 1982. He also holds a hospital appointment at The Nebraska Medical Center. Dr. Armitage has authored or co-authored more than 600 articles, 108 book chapters and edited or co-edited 27 textbooks. He has previously served as president of the American Society of Clinical Oncology ("ASCO"), and as a member of the ASCO board of directors. Dr. Armitage received a bachelor of science degree from the University of Nebraska and a medical degree from the

---

[7] Includes 57,000 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017, and 1,500 shares of common stock held by a family trust.

University of Nebraska Medical Center and completed his post-graduate training at the University of Nebraska Medical Center and the University of Iowa Hospitals and Clinics. The board of directors believes that Dr. Armitage's training as a physician, his research, clinical and administrative experience, and his previous service as a director of a publicly traded biopharmaceutical company provide him with the qualifications and skills to serve as a director.

**Defendant Collier**

43.     Defendant Earl M. "Duke" Collier, Jr. ("Collier") has served as a Company director since 2014. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Collier beneficially owned 38,666 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Collier owned over $5.9 million worth of TESARO stock.

44.     For the fiscal year ended December 31, 2017, Defendant Collier received $1,064,026 in compensation from the Company, comprised of $68,500 in fees earned or paid in cash, and $995,526 in option awards.

45.     The Company's 2018 Proxy Statement stated the following about Defendant Collier:

*Earl M. (Duke) Collier, Jr.* has served on our board of directors since May 2014. He has served as President of The Braxton Company, a healthcare strategy consulting firm, since 2015. From 2010 to 2014, Mr. Collier served as chief executive officer of 480 Biomedical and executive chair of Arsenal Medical, Inc., both of which are polymer biotherapeutics companies focused on serious clinical problems unable to be solved by current therapies. Mr. Collier was president at deCODE genetics, Inc., a biopharmaceutical company, from 2009 to 2010, and was executive vice president at Genzyme Corporation ("Genzyme"), a biotechnology company acquired by Sanofi S.A. in 2011, from 1997 to 2009. During his tenure at Genzyme, Mr. Collier was responsible for building the biosurgery, oncology and cardiovascular businesses and overseeing the company's efforts in multiple sclerosis. He also led some of Genzyme's significant acquisitions and the formation of MG Biotherapeutics, a Genzyme joint venture that focused on cardiac cell therapy. He also has served as president of Vitas Healthcare, a hospice provider, a partner at the law firm of Hogan & Hartson LLP, and deputy administrator of the

---

[8] Includes 38,666 shares of common stock subject to outstanding options that are exercisable within 60 days of March 31, 2017.

Health Care Finance Administration (now Centers for Medicare & Medicaid Services) in the U.S. Department of Health & Human Services. Mr. Collier received a bachelor of arts degree from Yale University and a law degree from the University of Virginia Law School. Mr. Collier serves on the board of directors of Capricor Therapeutics (OTC: CAPR), a regenerative medicine company, and the Board of Trustees of the Boston Athenaeum. He is also chairman of the board of trustees of Newton-Wellesley Hospital, serves on the board of Partners HealthCare System and is chair of the Innovation Advisory Board of Partners Healthcare Innovation. The board of directors believes Mr. Collier's experience in the life sciences industry as a senior executive and his service on the boards of directors of other life sciences companies provide him with the qualifications and skills to serve as a director.

**Defendant Mott**

46.     Defendant David M. Mott ("Mott") has served as a Company director since 2010 and as Chair of the Board since 2011. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Mott beneficially owned 10,330,595 shares of the Company's common stock, representing 19.2% of the Company's outstanding stock as of that date.[9] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Mott owned approximately $1.6 *billion* worth of TESARO stock.

47.     For the fiscal year ended December 31, 2017, Defendant Mott received $1,096,526 in compensation from the Company, comprised of $101,000 in fees earned or paid in cash, and $995,526 in option awards.

48.     The Company's 2018 Proxy Statement stated the following about Defendant Mott:

*David M. Mott* has served on our board of directors since May 2010 and as the Chairperson of the board of directors since July 2011. Mr. Mott has served as a general partner of New Enterprise Associates ("NEA"), an investment firm focused on venture capital and growth equity investments, since September 2008, where he

---

[9] Includes 12,149 shares of common stock held directly by Mr. Mott, 1,333 shares held directly by the David Mott Declaration of Trust dated March 31, 2001 (the "Mott Trust"), 42,000 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017, and the shares held directly by New Enterprise Associates 13, L.P. ("NEA 13"), and NEA 15 Opportunity Fund, L.P. ("NEA 15"). Mr. Mott, a general partner at New Enterprise Associates, disclaims beneficial ownership of all of the shares held directly by NEA 13, NEA 15 and the Mott Trust except to the extent of his pecuniary interest therein, if any.

leads the healthcare investing practice. From 1992 until 2008, Mr. Mott worked at MedImmune Limited, a biotechnology company and subsidiary of AstraZeneca Plc, and served in numerous roles during his tenure including from October 2000 through July 2008 as president and chief executive officer, and previously as chief financial officer, and as president and chief operating officer. During that time, Mr. Mott also served as executive vice president of AstraZeneca Plc from June 2007 to July 2008 following AstraZeneca's acquisition of MedImmune in June 2007. Prior to joining MedImmune, Mr. Mott was a vice president in the healthcare investment banking group at Smith Barney, Harris Upham & Co. Inc. Mr. Mott received a Bachelor of Arts degree from Dartmouth College. In connection with his role at NEA, Mr. Mott serves on the boards of various companies. Mr. Mott serves on the boards of the following public companies, all of which are companies in which NEA continues to be invested: Adaptimmune Therapeutics plc (NASDAQ: ADAP), Mersana Therapeutics, Inc. (NASDAQ: MRSN), Ardelyx, Inc. (NASDAQ: ARDX), Epizyme, Inc. (NASDAQ: EPZM), and Nightstar Therapeutics plc (NASDAQ: NITE). Mr. Mott is chairman of the board of each of these companies, other than Nightstar Therapeutics. Mr. Mott previously served on the board of directors of Omthera Pharmaceuticals from March 2011 until July 2013, Clementia Pharmaceuticals from June 2015 until February 2018, and Prosensa Holding, B.V. from January 2012 until January 2015. The board of directors believes Mr. Mott's experience in the life sciences industry as a senior executive and venture capitalist and his service on the boards of directors of other life sciences companies provide him with the qualifications and skills to serve as a director.

**Defendant Nicholson**

49.     Defendant Garry A. Nicholson ("Nicholson") has served as a Company director since 2015 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Nicholson beneficially owned 21,602 shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Nicholson owned over $3.3 million worth of TESARO stock.

---

[10] Includes 20,333 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017

50.     For the fiscal year ended December 31, 2017, Defendant Nicholson received $1,055,526 in compensation from the Company, comprised of $60,000 in fees earned or paid in cash, and $995,526 in option awards.

51.     The Company's 2018 Proxy Statement stated the following about Defendant Nicholson:

> *Garry A. Nicholson* has served on our board of directors since May 2015. Mr. Nicholson is currently retired and serves on the board of directors of biopharmaceutical company Five Prime Therapeutics, Inc. (NASDAQ: FPRX). He served as president and chief executive officer of XTuit Pharmaceuticals, Inc., a biopharmaceutical company, from September 2015 to October 2016. Prior to that, he served as president, Pfizer Oncology, from May 2008 until March 2015. He joined Pfizer, Inc. ("Pfizer"), as the first leader of its global, dedicated oncology business, with direct responsibility for business strategy and operations. He was responsible for clinical development for both early and late stage medicines, for all oncology sales and marketing organizations globally, and for licensing, acquisitions, and the oncology therapeutic area strategy. In addition to his oncology role, he was a member of the Portfolio Strategy and Investment Committee, the governance body with the oversight responsibility for Pfizer research and development. He also served as a member of the Pfizer Foundation board of directors. Prior to joining Pfizer, Mr. Nicholson worked at Eli Lilly and Company ("Lilly"), in a number of leadership roles, including sales management, marketing, human resources, and as the pharmaceutical commercial leader in Italy. He assumed responsibility for the sales and marketing of Lilly's cancer products in the U.S. in 1996 and subsequently managed oncology drug development. Mr. Nicholson earned a bachelor of science degree in pharmacy from the University of North Carolina, Chapel Hill, and a master of business administration degree from the University of South Carolina, Columbia. Mr. Nicholson has also served on the board of directors of SQZ Biotech, a cell therapy company, since December 2015. The board of directors believes Mr. Nicholson's extensive experience in the pharmaceutical industry as a senior executive provide him with the qualifications and skills to serve as a director.

**Defendant Oronsky**

52.     Defendant Arnold L. Oronsky ("Oronsky") served as a Company director from 2011 to May 10, 2018. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Oronsky beneficially owned 2,065,882 shares of the Company's common stock, representing 3.8%

of the Company's outstanding stock as of that date.[11] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Oronsky owned approximately $317.9 million worth of TESARO stock.

53.    For the fiscal year ended December 31, 2017, Defendant Oronsky received $1,045,526 in compensation from the Company, comprised of $50,000 in fees earned or paid in cash, and $995,526 in option awards.

54.    The Company's 2017 Proxy Statement stated the following about Defendant Oronsky:

> *Arnold L. Oronsky, Ph.D.* has served on our board of directors since June 2011. Dr. Oronsky has been a general partner with InterWest Partners, a venture capital firm, since 1994, focusing primarily on life science companies. Dr. Oronsky also serves as a senior lecturer at Johns Hopkins Medical School. Prior to joining InterWest Partners, Dr. Oronsky served as the vice president for discovery research at the Lederle Laboratories division of American Cyanamid Company. Dr. Oronsky holds a Ph.D. in immunology from Columbia University and an A.B. degree from New York University. Dr. Oronsky serves as chairman of the board of directors for Dynavax Technologies (NASDAQ: DVAX) and serves on the board of directors of Applied Genetic Technologies Corp. (NASDAQ: AGTC) and KalVista Pharmaceuticals (NASDAQ: KALV), all of which are biotechnology companies. In addition, Dr. Oronsky serves on the boards of directors of several privately held life science companies and served on the board of directors of MacroGenics, Inc. (NASDAQ: MGNX) until June 2014. The board of directors believes Dr. Oronsky's experience in the life sciences industry as a venture capitalist, his educational background and his service on the boards of directors of other public and private life sciences companies provide him with the qualifications and skills to serve as a director.

**Defendant Patel**

---

[11] Includes 10,096 shares of common stock held of record by Dr. Oronsky, 42,000 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017, and 2,013,786 shares held directly by InterWest Partners X, LP ("IW10"). Dr. Oronsky, a general partner at InterWest Partners, disclaims beneficial ownership of all of the shares held directly by IW10 except to the extent of his pecuniary interest therein, if any.

55.     Defendant Kavita Patel ("Patel") has served as a Company director since March 2016. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Patel beneficially owned 9,163 shares of the Company's common stock.[12] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Patel owned over $1.4 million worth of TESARO stock.

56.     For the fiscal year ended December 31, 2017, Defendant Patel received $1,050,526 in compensation from the Company, comprised of $55,000 in fees earned or paid in cash, and $995,526 in option awards.

57.     The Company's 2018 Proxy Statement stated the following about Defendant Patel:

*Kavita Patel, M.D.* has served on our board of directors since March 2016. Dr. Patel has been a Non-Resident Senior Fellow at The Brookings Institution, a premier research and thought leadership organization, since January 2011. In this role, Dr. Patel provides senior level vision and guidance for the Center for Health Policy in the Department of Economic Studies of the Institution, specifically helping healthcare systems understand how to transform their clinical environments to become more accountable for the care they provide. Dr. Patel has also been a practicing primary care physician at Johns Hopkins since January 2011. From 2009 to 2010, she served as Director of Policy for the Office on Intergovernmental Affairs and Public Engagement at The White House. Prior to that, she served as Deputy Staff Director for Health for Senator Edward M. Kennedy from 2007 to 2009. Dr. Patel currently serves as a member of the board of directors of SSM Healthcare, a nonprofit integrated delivery system, Community Catalyst, a national advocacy organization, and the National Initiative for Children's Healthcare Quality. She is also a member of the advisory board for the National Commission on Physician Payment Reform, the Robert Graham Center for Policy Studies in Family Medicine and Primary Care, and the Johns Hopkins Medicine Sibley Hospital Innovation Hub. Dr. Patel earned her bachelor of arts from the University of Texas at Austin, her M.D. from the University of Texas Health Science Center, and her master of science in health sciences from the University of California, Los Angeles. The board of directors believes Dr. Patel's years of healthcare leadership experience and clinical work in primary care, research, innovation, policy and advocacy provide her with the qualifications and skills to serve as a director.

**Defendant Seidenberg**

---

[12] Includes 8,000 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017

58.     Defendant Beth Seidenberg ("Seidenberg") has served as a Company director since 2011 and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of March 31, 2017, Defendant Seidenberg beneficially owned 2,977,590 shares of the Company's common stock, representing 5.5% of the Company's outstanding stock as of that date.[13] Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $153.87, Seidenberg owned approximately $10.2 million worth of TESARO stock.

59.     For the fiscal year ended December 31, 2017, Defendant Seidenberg received $1,055,526 in compensation from the Company, comprised of $60,000 in fees earned or paid in cash, and $995,526 in option awards.

60.     The Company's 2017 Proxy Statement stated the following about Defendant Seidenberg:

> *Beth Seidenberg, M.D.* has served on our board of directors since June 2011. Dr. Seidenberg has been a partner at Kleiner Perkins Caufield & Byers, a venture capital firm, since May 2005, where she has primarily focused on life science investing. Dr. Seidenberg was previously the senior vice president, head of global development and chief medical officer at Amgen, Inc., a biotechnology company. In addition, Dr. Seidenberg was a senior executive in research and development at Bristol Myers Squibb Company, a biopharmaceutical company, and Merck & Co., Inc., a healthcare company. Dr. Seidenberg received a bachelor of science degree from Barnard College and a medical degree from the University of Miami School of Medicine and completed her post-graduate training at Johns Hopkins University and the National Institutes of Health. Dr. Seidenberg serves on the boards of directors of ARMO BioSciences (NASDAQ: ARMO), Atara Biotherapeutics, Inc. (NASDAQ: ATRA), Epizyme, Inc. (NASDAQ: EPZM) and several privately held life sciences companies. The board of directors believes Dr. Seidenberg's training as a physician and her experience in the life sciences industry as a senior executive and venture capitalist provide her with the qualifications and skills to serve as a director.

---

[13] Includes 21,657 shares of common stock held of record by Dr. Seidenberg, 42,000 shares of common stock subject to outstanding options that were exercisable within 60 days of March 31, 2017, 410 shares held by trusts of which she and her spouse are co-trustees and her sons are beneficiaries, and the shares held directly by entities affiliated with Kleiner Perkins Caufield & Byers, whose beneficial ownership Dr. Seidenberg disclaims except to the extent of her pecuniary interest therein, if any.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

61.     By reason of their positions as officers and/or directors of TESARO and because of their ability to control the business and corporate affairs of TESARO, the Individual Defendants owed TESARO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage TESARO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of TESARO and its shareholders so as to benefit all shareholders equally.

62.     Each director and officer of the Company owes to TESARO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of TESARO, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64.     To discharge their duties, the officers and directors of TESARO were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

65.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of TESARO, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised TESARO's Board at all relevant times.

66.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Moreover, the Company's directors had a duty not to cause the Company to waste corporate assets by paying themselves excessive compensation and to engage in the Waste Misconduct.

67.     To discharge their duties, the officers and directors of TESARO were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of TESARO were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to TESARO's own Code of Business Conduct and Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how TESARO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of TESARO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that TESARO's operations would comply with all applicable laws and TESARO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.     Each of the Individual Defendants further owed to TESARO and the shareholders the duty of loyalty requiring that each favor TESARO's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Individual Defendants were the agents of each other and of TESARO and were at all times acting within the course and scope of such agency.

70.     Because of their advisory, executive, managerial, and directorial positions with TESARO, each of the Individual Defendants had access to adverse, non-public information about the Company.

71.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by TESARO.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein, and the Company's directors caused the Company to waste corporate assets by paying themselves excessive compensation and to engage in the Waste Misconduct. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (iii) to engage in the Waste Misconduct; (iv) artificially inflate the Company's stock price; and (v) waste the Company's corporate assets by paying the Individual Defendants serving as directors excessive compensation.

74.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. The Individual Defendants serving as directors also caused the Company to waste corporate assets by paying themselves excessive compensation and to engage in the Waste Misconduct.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of TESARO was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of TESARO, and was at all times acting within the course and scope of such agency.

## TESARO'S CODE OF ETHICS

77.     The Company's Code of Business Conduct and Ethics (the "Code of Ethics") "applies to the Company's and its subsidiaries' directors, officers and associates (collectively, '**Covered Persons**')."

78.     The Company's Code of Ethics:

outlines our commitment, as a Company and as individuals, to honest and ethical conduct and adherence to the highest levels of integrity in service to patients, the medical community, colleagues and shareholders. We conduct all TESARO activities in accordance with the principles described in the Code, which are in turn grounded in our corporate values.

79.     The Code of Ethics states that "[w]e safeguard patients by: (i) conducting research in compliance with applicable laws and best practices; (ii) respecting patient privacy; and (iii) communicating accurate safety information about our products."

80.     The Code of Ethics provides, in a section titled "We Conduct Business Honestly and Ethically," that:

• We act with the highest standards of personal and professional integrity and do not tolerate others who attempt to deceive or evade responsibility for their actions.

• We are direct, honest and truthful in discussions and interactions with the Board, regulatory agency officials and government officials, as well as in all dealings with business partners and stockholders.

81.     The Code of Ethics provides, in a section titled "We Comply with Applicable Laws, Rules and Regulations," that:

• We respect and obey the laws of the cities, states and countries in which we operate and the rules and regulations applicable to the Company's business, both in letter and in spirit.

• We understand that as a public biopharmaceutical company we operate in a heavily regulated industry and are subject to a wide range of laws, rules and regulations, including but not limited to those related to public company reporting, corporate governance and disclosures, drug development, research and commercialization, bribery, and fair competition.

• We understand that these laws are complex and require that Covered Persons take steps to become familiar with those laws, rules and regulations relevant to their areas of responsibilities within the Company.

82.     The Code of Ethics provides, that "[w]e do not use or share confidential information for stock trading purposes, or for any other purpose, except the conduct of Company business."

83.     The Code of Ethics provides, in a section titled "We Maintain Accurate Records and Communicate Responsibly," that:

• We keep accurate Company books and records, complying fully with all applicable financial reporting and accounting regulations.

• We ensure that all of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect the Company's transactions and conform to applicable legal requirements, the Company's system of internal controls and accounting principles generally accepted in the United States.

• We do not make false, misleading or artificial entries into the Company's books or records, and follow internal accounting controls established to ensure the complete and accurate recording of all transactions.

• We are committed to accurate, timely and understandable communications through public disclosures and regulatory filings, balancing the importance of disclosure with the need and importance for confidentiality with respect to non-public negotiations or other business developments.

84.     The Code of Ethics provides, with respect to violations thereof, that "[a]ny Covered Person who becomes aware of an existing or potential violation of this Code, of any law, rule or regulation or of Company policy has an obligation to report the complaint or concern."

85.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, and the Company directors' scheme to waste corporate assets by causing the Company to pay themselves excessive compensation and to engage in the Waste Misconduct. Three of the Individual Defendants violated the code by selling shares of Company stock during the Relevant Period while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Ethics, the Individual Defendants serving as Company directors caused the Company to waste corporate assets by paying themselves excessive compensation, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

86.     TESARO is a commercial-stage biopharmaceutical company focused on providing innovative therapies for cancer patients.

87.     TESARO's product portfolio includes, and included at all relevant times, VARUBI (rolapitant), which is a neurokinin-1 ("NK-1") receptor antagonist for the prevention of chemotherapy induced nausea and vomiting.

88.     The FDA approved VARUBI's oral formulation in September 2015.

89.     The Company submitted a New Drug Application ("NDA") for VARUBI IV on March 14, 2016.

90.     The Company announced that the FDA had approved VARUBI IV on October 25, 2017.

91.     The only other product for which TESARO has received regulatory approval is

ZEJULA, which was approved by the FDA in March 2017. Thus, VARUBI is highly material to

the Company's commercial success.

**False and Misleading Statements**

*March 14, 2016 Press Release*

92.     On March 14, 2016, the Company issued a press release titled "TESARO Submits

New Drug Application for Intravenous Rolapitant to the U.S. Food and Drug Administration." The

press release stated, in relevant part:

> WALTHAM, Mass., March 14, 2016 (GLOBE NEWSWIRE) -- TESARO, Inc.
> (NASDAQ:TSRO), an oncology-focused biopharmaceutical company, today
> announced that it has submitted the New Drug Application (NDA) for an
> intravenous (IV) formulation of rolapitant to the U.S. Food and Drug
> Administration (FDA).
>
> Rolapitant is a substance P/neurokinin-1 (NK-1) receptor antagonist that is
> marketed in tablet formulation by TESARO in the United States under the brand
> name VARUBI®. The FDA approved VARUBI on September 1, 2015, for use in
> combination with other antiemetic agents in adults, for the prevention of delayed
> nausea and vomiting associated with initial and repeat courses of emetogenic cancer
> chemotherapy, including, but not limited to, highly emetogenic chemotherapy.
>
> "TESARO is committed to advancing new therapeutic options for patients with
> cancer, and the NDA submission for IV rolapitant represents a significant milestone
> for the Company," said Mary Lynne Hedley, Ph.D., President and COO of
> TESARO. "By developing an intravenous formulation of rolapitant, our goal is to
> provide oncologists additional flexibility in their choice of antiemetic regimens."
>
> The NDA for IV rolapitant is supported by data from a clinical program that
> enrolled more than 400 subjects and included a bioequivalence study and several
> other supportive non-clinical and clinical studies. TESARO anticipates a standard
> 12- month review timeline for the IV rolapitant NDA.

*Q1 2016 10-Q*

93.     On May 6, 2016, the Company filed a report with the SEC for the fiscal quarter

ended March 31, 2016 on Form 10-Q (the "Q1 2016 10-Q") providing the Company's quarterly

financial results and position. The Q1 2016 10-Q was signed by Defendants Moulder and Pearson.

The Q1 2016 10-Q reported a net loss of $90.8 million on revenue of $307,000 for the quarter, compared to a net loss of $48.5 million on zero revenue in the prior year quarter.

94.     The Q1 2016 10-Q provided summary descriptions of the Company's current products and product candidates, including rolapitant, stating, in relevant part:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV. The oral form of rolapitant, VARUBI, has been approved for commercialization in the United States, and we are also developing an intravenous, or IV, formulation of rolapitant. In March 2016, we submitted a new drug application, or NDA, for IV rolapitant to the FDA. We also submitted a Marketing Authorisation Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016.

95.     Attached to the Q1 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Moulder and Pearson attesting to the accuracy of the Q1 2016 10-Q.

### Q2 2016 10-Q

96.     On August 5, 2016, the Company filed a quarterly report for the fiscal quarter ended June 30, 2016 on Form 10-Q (the "Q2 2016 10-Q") providing the Company's quarterly financial results and position. The Q2 2016 10-Q was signed by Defendants Moulder and Pearson. The Q2 2016 10-Q reported a net loss of $58.4 million on revenue of $36.6 million for the quarter, compared to a net loss of $60.6 million on zero revenue in the prior year quarter.

97.     The Q2 2016 10-Q provided summary descriptions of the Company's current products and product candidates, including rolapitant, stating, in relevant part:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV. The oral form of rolapitant, VARUBI, has been approved for commercialization in the United States, and we are also developing an intravenous, or IV, formulation of rolapitant. In March 2016, we submitted a new drug application, or NDA, for IV rolapitant to the FDA which was accepted for review in May 2016, with a target Prescription Drug User Fee Act, or PDUFA, date of January 11, 2017. We also

submitted a Marketing Authorisation Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016, which the EMA has validated.

98.     Attached to the Q2 2016 10-Q were SOX certifications signed by Defendants Moulder and Pearson, attesting to the accuracy of the Q2 2016 10-Q.

### Q3 2016 10-Q

99.     On November 4, 2016, the Company filed with the SEC a quarterly report for the fiscal quarter ended September 30, 2016 on Form 10-Q (the "Q3 2016 10-Q") providing the Company's quarterly financial results and position. The Q3 2016 10-Q was signed by Defendants Moulder and Pearson. The Q3 2016 10-Q reported a net loss of $101.2 million on revenue of $3.7 million for the quarter, compared to a net loss of $66.6 million on revenue of $87,000 in the prior year quarter.

100.    Regarding the Company's business, the Q3 2016 10-Q stated, in relevant part:

On September 1, 2015, the Company's first commercial product, VARUBI® (rolapitant), was approved by the United States Food and Drug Administration, or FDA, in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy. The Company commenced sales of VARUBI during the fourth quarter of 2015. In March 2016, the Company submitted a new drug application, or NDA, for intravenous rolapitant to the FDA which was accepted for review in May 2016, with a target Prescription Drug User Fee Act, or PDUFA, date of January 11, 2017. The Company also submitted a Marketing Authorization Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016, which the EMA has accepted for review.

101.    The Q3 2016 10-Q provided summary descriptions of the Company's current products and product candidates, including rolapitant, stating, in relevant part:

*Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV. The oral form of rolapitant, VARUBI, has been approved for commercialization in the United States, and we are also developing an intravenous, or IV, formulation of rolapitant. In March 2016, we submitted a new drug application, or NDA, for IV

rolapitant to the FDA which was accepted for review in May 2016, with a target Prescription Drug User Fee Act, or PDUFA, date of January 11, 2017. We also submitted a Marketing Authorization Application, or MAA, for oral rolapitant to the European Medicines Agency, or EMA, in March 2016, which the EMA has accepted for review.

102.    Attached to the Q3 2016 10-Q were SOX certifications signed by Defendants Moulder and Pearson, attesting to the accuracy of the Q3 2016 10-Q.

### *2016 10-K*

103.    On February 28, 2017, the Company filed with the SEC its report for the fiscal quarter and year ended December 31, 2016 on Form 10-K (the "2016 10-K") providing the Company's quarterly and year-end financial results and position. The 2016 10-K was signed by all of the Individual Defendants. The 2016 10-K reported a net loss of $136.9 million on revenue of $4.2 million for the quarter, compared to a net loss of $75.8 million on revenue of $230,000 in the prior year quarter. For the year ended December 31, 2016, the 2016 10-K reported a net loss of $387.5 million on revenue of $44.8 million, compared to a net loss of $251.4 million on revenue of $317,000 in the prior year.

104.    The 2016 10-K provided summary descriptions of the Company's current products and product candidates, including rolapitant, stating, in relevant part:

*Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The oral form of rolapitant, VARUBI, is approved for commercialization in the United States, and we are developing an IV formulation of rolapitant.  We submitted a new drug application, or NDA, for rolapitant IV to the FDA in March 2016.  In January 2017, the FDA issued a Complete Response Letter requesting additional information regarding the *in vitro* release method utilized to characterize the drug product and demonstrate comparability of drug product produced by our two proposed commercial manufacturers of rolapitant IV that were included in the NDA.  We will need to provide the additional requested information to the FDA in the form of a resubmission of the NDA, which the FDA will need to deem acceptable, in order for the NDA to be approved and for us to be allowed to market and sell rolapitant IV in the U.S. We also submitted a Marketing Authorization Application, or MAA, for oral rolapitant to the European Medicines Agency, or

EMA, in March 2016. In February 2017, the EMA's Committee for Medicinal Products for Human Use, or CHMP, rendered a positive opinion for our MAA for oral rolapitant, for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults.

105.    Regarding the Company's business strategy, the 2016 10-K stated, in relevant part:

**Our Strategy**

Our strategy is to leverage the experience and competencies of our management team to identify, acquire and develop promising drug candidates and to commercialize cancer therapeutics that are potentially safer and more effective than existing treatments.

The key components of our strategy are:
* * *
• ***Successfully Commercialize Rolapitant for the Prevention of CINV.*** On September 1, 2015, our first commercial product, VARUBI, was approved by the FDA, for use in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy. We launched VARUBI in November 2015. Our rolapitant program also includes the development of an IV formulation, for which we submitted an NDA to the FDA in March 2016. We also submitted an MAA for oral rolapitant to the EMA in March 2016. Pending regulatory approvals, we intend to launch rolapitant IV in the U.S., and oral rolapitant in Europe, in the second half of 2017. We intend to establish rolapitant as part of the standard of care for the prevention of CINV in patients who, consistent with established treatment guidelines, could benefit from an NK-1 receptor antagonist, in addition to treatment with a 5-HT3 receptor antagonist plus a corticosteroid.

106.    Attached to the 2016 10-K were SOX certifications signed by Defendants Moulder and Pearson, attesting to the accuracy of the 2016 10-K.

***2017 Proxy Statement***

107.    The Company filed its 2017 Proxy Statement with the SEC on April 7, 2017. Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.

Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

108.    The 2017 Proxy Statement stated, regarding the Code of Ethics, that:

> The Code of Ethics is designed to promote the highest standards of ethical conduct by our directors, executive officers and employees. The Code of Ethics requires that our directors, executive officers and employees avoid conflicts of interest, comply with applicable laws and other legal requirements, conduct business in an honest and ethical manner and otherwise act with integrity and in our best interest. Under the terms of the Code of Ethics, directors, executive officers and employees are required to report any existing or potential violation of the Code of Ethics of which they become aware. We intend to disclose future amendments to the Code of Ethics, or any waivers of its requirements, on our website or in filings under the Securities Exchange Act of 1934 (the "Exchange Act"), to the extent required by the applicable rules and exchange requirements.

109.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein.

110.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were misrepresented as a result of false and misleading statements.  Indeed, the directors' present excessive level of compensation is and will be harmful to both the Company and its shareholders as it wastes valuable and limited corporate assets.

111.    The 2017 Proxy Statement also failed to disclose that: (1) substantial health risks were associated with VARUBI IV, including anaphylaxis and anaphylactic shock; (2) as a result of the foregoing, the Company would be forced to cease marketing and distribution of VARUBI IV, need to pursue strategic alternatives for the VARUBI brand, and would be forced to write down $18.7 million of VARUBI that the Company was unable to sell; (3) the Company engaged

in the Waste Misconduct; and (4) the Company failed to maintain internal controls; and, (3) the Company failed to maintain internal controls.

### Q1 2017 10-Q

112.    On May 9, 2017, the Company filed a report with the SEC for the fiscal quarter ended March 31, 2017 on Form 10-Q (the "Q1 2017 10-Q") providing the Company's quarterly financial results and position. The Q1 2017 10-Q was signed by Defendants Moulder and Pearson. The Q1 2017 10-Q reported a net loss of $136.7 million on revenue of $3.1 million for the quarter, compared to a net loss of $91 million on revenues of $300,000 in the prior year quarter, as revised.

113.    The Q1 2017 10-Q provided summary descriptions of the Company's current products and product candidates, including rolapitant, stating, in relevant part:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV. The oral form of rolapitant, VARUBI, is approved in the United States for use in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy. The European Commission also approved oral rolapitant for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults in April 2017. We will market rolapitant in the European Union under the brand name VARUBY®. We are also developing an intravenous, or IV, formulation of rolapitant. We submitted a new drug application, or NDA, for rolapitant IV to the United States Food and Drug Administration, or FDA, in March 2016. ***In January 2017, the FDA issued a Complete Response Letter requesting additional information regarding the in vitro release method utilized to characterize the drug product and demonstrate comparability of drug product produced by our two proposed commercial manufacturers of rolapitant IV that were included in the NDA. We resubmitted the NDA with such information to the FDA in April 2017, and the FDA will need to review and approve the resubmitted NDA in order for us to be allowed to market and sell rolapitant IV in the U.S.***

(Emphasis added.)

114.    Attached to the Q1 2017 10-Q were SOX certifications signed by Defendants Moulder and Pearson, attesting to the accuracy of the Q1 2017 10-Q.

### *Q2 2017 10-Q*

115.    On August 8, 2017, the Company filed with the SEC a quarterly report for the fiscal

quarter ended June 30, 2017 on Form 10-Q (the "Q2 2017 10-Q") providing the Company's

quarterly financial results and position. The Q2 2017 10-Q was signed by Defendants Moulder and

Pearson. The Q2 2017 10-Q reported a net loss of $152.1 million on revenue of $29.5 million for

the quarter, compared to a net loss of $59.2 million on revenues of $35.8 million in the prior year

quarter, as revised.

116.    The Q2 2017 10-Q provided summary descriptions of the Company's current

products and product candidates, including rolapitant, stating, in relevant part:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist
> for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The
> oral form of rolapitant, VARUBI, is approved in the United States for use in
> combination with other antiemetic agents in adults for the prevention of delayed
> nausea and vomiting associated with initial and repeat courses of emetogenic cancer
> chemotherapy, including, but not limited to, highly emetogenic chemotherapy.  The
> European Commission also approved oral rolapitant for the prevention of delayed
> nausea and vomiting associated with highly and moderately emetogenic
> chemotherapy in adults in April 2017.  We market rolapitant in the European Union
> under the brand name VARUBY®, and commenced sales of VARUBY in May
> 2017 on a country-by-country basis.  We are also developing an intravenous, or IV,
> formulation of rolapitant. We submitted a new drug application, or NDA, for
> rolapitant IV to the United States Food and Drug Administration, or FDA, in March
> 2016.  In January 2017, the FDA issued a Complete Response Letter requesting
> additional information regarding the in vitro release method utilized to characterize
> the drug product and demonstrate comparability of drug product produced by our
> two proposed commercial manufacturers of rolapitant IV that were included in the
> NDA.  We resubmitted the NDA with such information to the FDA in April 2017,
> and the FDA will need to review and approve the resubmitted NDA in order for us
> to be allowed to market and sell rolapitant IV in the U.S.  The target Prescription
> Drug User Fee Act action date is October 25, 2017

117.    Attached to the Q2 2017 10-Q were SOX certifications signed by Defendants

Moulder and Pearson, attesting to the accuracy of the Q2 2017 10-Q.

### *October 25, 2017 Press Release*

118.   On October 25, 2017, the Company issued a press release titled "TESARO Announces U.S. FDA Approval of VARUBI® IV for Delayed Nausea and Vomiting Associated With Cancer Chemotherapy." The press release stated, in relevant part:

WALTHAM, MA, October 25, 2017 — TESARO, Inc. (NASDAQ: TSRO), an oncology-focused biopharmaceutical company, today announced that the U.S. Food and Drug Administration (FDA) has approved VARUBI® (rolapitant) IV in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy. Delayed nausea and vomiting can occur anytime between 25 and 120 hours following chemotherapy, and is often extremely debilitating.

VARUBI is a highly selective and competitive antagonist of human substance P/neurokinin 1 (NK-1) receptors, which play an important role in the delayed phase of chemotherapy-induced nausea and vomiting (CINV). With a long plasma half-life of approximately seven days, a single dose of VARUBI, as part of an antiemetic regimen, significantly improved complete response (CR) rates in the delayed phase of CINV. Results from three Phase 3 trials of VARUBI oral tablets demonstrated a significant reduction in episodes of vomiting or use of rescue medication during the 25- to 120-hour period following administration of highly emetogenic and moderately emetogenic chemotherapy regimens. In addition, patients who received VARUBI reported experiencing less nausea that interfered with normal daily life and fewer episodes of vomiting or retching over multiple cycles of chemotherapy. Results from a bioequivalence trial have demonstrated comparability of the IV and oral formulations of VARUBI.

\* \* \*

"The approval of VARUBI IV represents a significant milestone for TESARO. The majority of NK-1 receptor antagonist doses are administered intravenously in the U.S., and with the introduction of VARUBI IV, we now offer healthcare providers a unique, easy-to-use option that fits well into standard operating practices of a chemotherapy clinic or hospital," said Mary Lynne Hedley, Ph.D., President and COO of TESARO. "We will continue our efforts to expand awareness of delayed chemotherapy-induced nausea and vomiting and plan to make this important medicine available next month."

"Many healthcare providers tend to believe that CINV is no longer an unmet need, but the reality is that more than half of patients treated with emetogenic chemotherapy experience delayed CINV, even when prescribed standard preventative therapies, such as a 5-HT3 receptor antagonist and dexamethasone," said Lee Schwartzberg, M.D., Professor of Medicine at University of Tennessee Health Science Center. "The FDA approval of VARUBI IV gives doctors and

nurses a new option to help protect their patients from these often preventable side effects."

### Q3 2017 10-Q

119.   On November 7, 2017, the Company filed with the SEC a quarterly report for the fiscal quarter ended September 30, 2017 on Form 10-Q (the "Q3 2017 10-Q") providing the Company's quarterly financial results and position. The Q3 2017 10-Q was signed by Defendants Moulder and Pearson. The Q3 2017 10-Q reported a net loss of $25.3 million on revenue of $142.8 million for the quarter, compared to a net loss of $87.9 million on revenues of $17 million in the prior year quarter, as revised.

120.   The Q3 2017 10-Q provided summary descriptions of the Company's current products and product candidates, including rolapitant, stating, in relevant part:

> *Rolapitant* is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV. The oral form of rolapitant, VARUBI, is approved in the United States for use in combination with other antiemetic agents in adults for the prevention of delayed nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy. In October 2017, the United States Food and Drug Administration, or FDA, approved our new drug application, or NDA, for the intravenous, or IV, formulation of rolapitant. We expect to commence sales of VARUBI IV in the U.S. in the fourth quarter of 2017. The European Commission also approved oral rolapitant for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults in April 2017. We market rolapitant in the European Union under the brand name VARUBY®, and commenced sales of VARUBY in May 2017 on a country-by-country basis.

121.   Attached to the Q3 2017 10-Q were SOX certifications signed by Defendants Moulder and Pearson, attesting to the accuracy of the Q3 2017 10-Q.

122.   The statements referenced in ¶¶ 92-106 and 112-21 above were materially false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose material adverse facts about TESARO's business,

operational and compliance policies. Specifically, those statements failed to disclose that: (1) substantial health risks were associated with VARUBI IV, including anaphylaxis and anaphylactic shock; (2) as a result of the foregoing, the Company would be forced to cease marketing and distribution of VARUBI IV, need to pursue strategic alternatives for the VARUBI brand, and would be forced to write down $18.7 million of VARUBI that the Company was unable to sell; (3) the Company engaged in the Waste Misconduct; and, (4) the Company failed to maintain internal controls.. As result of these misrepresentations, TESARO's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

*January 12, 2018 Press Release; DHCP Letter*

123.    On January 12, 2018, TESARO issued a press release titled "TESARO Announces Updates to the U.S. Prescribing Information for VARUBI® (rolapitant) Injectable Emulsion," which stated, in relevant part:

> WALTHAM, Mass., Jan. 12, 2018 — TESARO, Inc. (NASDAQ:TSRO), an oncology-focused biopharmaceutical company, today announced that it has updated the VARUBI® (rolapitant) injectable emulsion package insert in collaboration with the U.S. Food and Drug Administration (FDA). VARUBI injectable emulsion is a substance P/neurokinin (NK-1) receptor antagonist indicated for the prevention of delayed nausea and vomiting associated with chemotherapy in adults. The changes to the labeling include modifications to the CONTRAINDICATIONS, WARNINGS and PRECAUTIONS, and ADVERSE REACTIONS sections.
>
> Following its introduction in late November 2017, TESARO estimates that at least 7,000 doses of VARUBI injectable emulsion have been administered to patients receiving emetogenic chemotherapy in the United States. ***Anaphylaxis, anaphylactic shock and other serious hypersensitivity reactions have been reported in the postmarketing setting, some requiring hospitalization. These reactions have occurred during or soon after the infusion of VARUBI injectable emulsion. Most reactions have occurred within the first few minutes of administration.***
>
> Patient safety is a paramount priority for TESARO. ***In its commitment to ensuring patients and healthcare professionals are aware of the label update, TESARO has issued a Dear Healthcare Professional (DHCP) letter.*** This letter, as well as

the updated full prescribing information, has been posted on the VARUBI website (www.varubirx.com). Additionally, members of the TESARO field force will be calling on healthcare professionals to communicate this important new safety information.

Healthcare providers and patients are encouraged to report adverse events in patients taking VARUBI injectable emulsion to TESARO at 1-844-4-TESARO (1-844-483-7276). TESARO's medical information department may be reached at 1-844-4-TESARO (1-844-483-7276) to address any questions from healthcare providers about the information contained in this release, or the safe and effective use of VARUBI injectable emulsion.

(Emphasis added.)

124.    The DHCP Letter stated, in relevant part:

**Prescriber Action**

Healthcare professionals must be vigilant for signs of hypersensitivity or anaphylaxis in all patients receiving VARUBI® (rolapitant) injectable emulsion, both during and following its administration.

It is advised that Healthcare professionals consult with patients to determine if the patient is hypersensitive to any component of the product (including soybean oil). Furthermore, as cross reactions to other allergens is possible, patients with known allergies to legumes or other related allergens should be monitored closely. Patients with a potential hypersensitivity should not be administered VARUBI® (rolapitant) injectable emulsion.

125.    On this news, price per share of TESARO stock dropped from a closing price of $69.59 on the prior trading day, January 12, 2018, to close at $65.52 per share on January 16, 2018 -- a drop of 5.8%, or $4.07.

126.    The statements referenced in ¶¶ 123-24 above were materially false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose material adverse facts about TESARO's business, operational and compliance policies. Specifically, those statements were false and misleading and failed to disclose that: (1) as a result of substantial health risks associated with VARUBI IV, including anaphylaxis and anaphylactic shock, the Company would be forced to cease marketing and

distribution of VARUBI IV and need to pursue strategic alternatives for the VARUBI brand, and would be forced to write down $18.7 million of VARUBI that the Company was unable to sell; (2) the Company engaged in the Waste Misconduct; and (3) the Company failed to maintain internal controls. As result of these misrepresentations, TESARO's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

***February 27, 2018 Press Release***

127.    On February 27, 2018, TESARO issued a press release titled "TESARO Announces Fourth-Quarter and Full-Year 2017 Operating Results," which stated, in relevant part:

> In January 2018, the package insert for VARUBI IV was updated to include mention of new adverse events, including anaphylaxis, anaphylactic shock and other serious hypersensitivity reactions, which were reported in the post-marketing setting following its introduction in late November 2017. ***Given these dynamics, TESARO believes the market opportunity is more limited than previously anticipated, and will suspend distribution of VARUBI IV while continuing to support VARUBI oral tablets.*** The Company is considering strategic alternatives for the product, including out-licensing, and will re-direct Company resources in support of ZEJULA.

(Emphasis added.)

128.    On this news, price per share of TESARO stock dropped from a close of $61.55 on February 27, 2018 to close at $55.23 per share on February 28, 2018 -- a drop of 10.3%, or $6.32.

***2017 10-K***

129.    On February 28, 2018, after markets closed, the Company filed with the SEC its report for the fiscal quarter and year ended December 31, 2017 on Form 10-K (the "2017 10-K") providing the Company's quarterly and yearly financial results and position.

130.    The 2017 10-K provided an overview of the Company's business, stating, in relevant part:

VARUBI® (rolapitant) is a potent and long-acting neurokinin-1, or NK-1, receptor antagonist for the prevention of chemotherapy induced nausea and vomiting, or CINV.  The FDA approved VARUBI in oral formulation in September 2015 for use in combination with other antiemetic agents in adults for the prevention of delayed (24 to 120 hours after chemotherapy administration) nausea and vomiting associated with initial and repeat courses of emetogenic cancer chemotherapy, including, but not limited to, highly emetogenic chemotherapy.  The EC approved VARUBY®, the brand name of oral rolapitant in Europe, in April 2017 for the prevention of delayed nausea and vomiting associated with highly and moderately emetogenic chemotherapy in adults.  The FDA approved the intravenous, or IV, formulation of VARUBI in October 2017.  In January 2018, after post-marketing reports of side effects experienced following the commercial introduction of VARUBI IV, we updated the VARUBI IV package insert, including modifications to the contraindications, warnings and precautions, and adverse reactions sections, and issued a "Dear Healthcare Professional Letter" to healthcare providers to highlight the updates.  ***In February 2018, we determined that we would cease marketing and distribution of VARUBI IV and pursue strategic alternatives for the VARUBI brand, including potentially out-licensing the VARUBI product line***.

(Emphasis added.)

131.    Regarding the Company's revenues, the 2017 10-K stated, in relevant part:

We launched the IV formulation of VARUBI in the U.S. in November 2017.  We offered significant launch discounts to our customers, which resulted in large purchases by several of our customers in the first few weeks of the launch.  In January 2018, after post-marketing reports of side effects experienced following the commercial introduction of VARUBI IV, we updated the VARUBI IV package insert, including modifications to the contraindications, warnings and precautions, and adverse reactions sections, and issued a "Dear Healthcare Professional Letter" to healthcare providers to highlight the updates.  As a result, ***we expect the vast majority of VARUBI IV units shipped to our customers in 2017 to be returned in 2018. Due to the resulting significant reserve for returns, VARUBI IV net product revenue of $0.5 million (net of returns reserve of $24.8 million) was significantly lower than the gross revenue value of units that we shipped to customers during the fourth quarter of 2017.***  In addition, we have recorded a write-down of VARUBI inventories, as further described below in "Cost of Sales – Product".

132.    Regarding the Company's cost of sales, the 2017 10-K stated, in relevant part:

*Cost of Sales - Product.*  Cost of sales of $1.2 million for the year ended December 31, 2016 (as revised) consists primarily of costs associated with the manufacturing of VARUBI and royalties owed to our licensor for VARUBI sales, as well as costs of product provided under our sampling and other commercial programs and certain period costs.  Cost of sales of $41.1 million for the year ended December 31,

2017 includes ZEJULA manufacturing costs and royalties, and to a lesser extent, VARUBI manufacturing costs and royalties from sales. ***The amount also includes a $16.7 million in lower of cost or market write-down for excess and obsolete VARUBI inventories.*** In addition, a $1.6 million loss on firm purchase commitments was also recorded as a component of cost of sales within the period. Due to the update to the VARUBI IV package insert described above, we lowered our internal forecasts of future sales of VARUBI IV, and performed an analysis of the recoverability of our VARUBI inventories. As a result of this analysis, ***we concluded that a significant portion of our VARUBI inventories was unlikely to be utilized in future product sales prior to expiration, and thus recorded the write-down as a component of cost of product sales***. We accrued a $1.8 million royalty obligation as of December 31, 2016 related to the contractual minimum royalty commitment, and this amount was capitalized in the 'other assets' caption on the consolidated balance sheet, as we had concluded at the time that the shortfall would likely be recoverable through future years' sales. ***Due to the revised forecast of future VARUBI sales described above, we concluded the royalty shortfall amount would no longer be recoverable through future years' sales, and wrote off $2.0 million as a component of cost of product sales***.

(Italicized subheading in original; otherwise emphasis added.)

133.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

134.    Moreover, the Individual Defendants breached their fiduciary duties by willfully or recklessly failing to correct and causing the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein.

135.    In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly failed to maintain internal controls.

## WASTE OF CORPORATE ASSETS

136.    The Individual Defendants breached their fiduciary duties by causing the Company to overproduce VARUBI, leading the Company to write down millions of dollars' worth of product in the fiscal year ended December 31, 2017.

137.     As revealed by the Company's 2017 10-K, the Company's cost of sales in the fiscal year ended December 31, 2017 included a write down of $16.7 million for excess and obsolete VARUBI inventory.

138.     The Company's 2017 10-K further revealed that cost of product sales in the fiscal year ended December 31, 2017 also included a $2.0 million write down based on the Company's conclusion that due to the updated package insert for VARUBI IV, a significant portion of its VARUBI inventory was unlikely to be used prior to its expiration date.

139.     Thus, in total, the Individual Defendant's conduct caused the Company to incur $18.7 million in write-downs associated with the Company's inventory of VARUBI, recorded as cost of product sales in the fiscal year ended December 31, 2017.

## EXCESSIVE COMPENSATION

140.     TESARO's directors, namely Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg, breached their fiduciary duties by improperly awarding themselves excessive compensation, thereby wasting corporate assets.

141.     In 2017, each incumbent non-employee director received an annual award of options to purchase 12,000 shares of TESARO common stock and any newly-appointed non-employee director would have been eligible to receive a one-time initial award of options to purchase 24,000 shares of TESARO common stock.

142.     For the year ended December 31, 2017, the non-employee Individual Defendants serving on the Board each received over $1 million in compensation from the Company ($1,060,776 on average) consisting of fees earned and stock options.

143.    Such an amount is multiple times higher than the average total director compensation of $275,058[14] for a Fortune 100 company, the average of $288,909[15] for an S&P 500 company, and the median total non-employee director compensation for 2017 of $201,667[16] for a sample of 100 mid-cap ($1 billion to $5 billion market capitalization) companies.

144.    TESARO, notably, is not a Fortune 50 company nor a S&P 500 company.

145.    The current excessive level of compensation to non-employee members of the Board is and will continue to be harmful to both TESARO and its shareholders and wastes valuable and corporate assets.

## DAMAGES TO TESARO

146.    As a direct and proximate result of the Individual Defendants' conduct, TESARO has lost and will continue to lose and expend many millions of dollars.

147.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

148.    These losses include $18.7 million in write-downs as a component cost of product sales as a result of excess and obsolete inventory of VARUBI and the Company's conclusion that a significant portion of its VARUBI inventory was unlikely to be utilized in the future due to the Waste Misconduct and the update to VARUBI IV"s package insert.

---

[14] *See* Meridian Compensation Partners, LLC's 2015 Trends in Outside Director Compensation, p. 4.
[15] *See* Spencer Stuart's U.S. Board Index 2017, p. 35.
[16] *See* Frederic W. Cook & Co., Inc.'s 2017 Director Compensation Report, p. 1.

149.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

150.     As a direct and proximate result of the Individual Defendants' conduct, TESARO has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

151.     Plaintiff brings this action derivatively and for the benefit of TESARO to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of TESARO, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

152.     TESARO is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

153.     Plaintiff is, and has been at all relevant times, a shareholder of TESARO. Plaintiff will adequately and fairly represent the interests of TESARO in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

154.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

155.    A pre-suit demand on the Board of TESARO is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten directors: Defendants Alleva, Armitage, Collier, Hedley, Mott, Moulder, Nicholson, Patel and Seidenberg (the "Director-Defendants") and non-party Pascale Witz. Plaintiff needs only to allege demand futility as to five of the directors who are on the Board at the time this action is commenced.

156.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in the Waste Misconduct, to make false and misleading statements and omissions of material facts, and to award themselves excessive compensation, while three of them engaged in insider sales based on material non-public information, netting proceeds of over $2.1 million which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

157.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to engage in the Waste Misconduct, to make the materially false and misleading statements alleged herein, and to award themselves excessive compensation. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

158.    Additional reasons that demand on Defendant Moulder is futile follow. Defendant Moulder is one of the Company's co-founders, a long-time Company director, and the Company's CEO, and is thus, as the Company admits, a non-independent director. He receives lavish

compensation, including over $6 million in 2017. His large Company stock holding, worth over $325 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, he conducted little, if any, oversight of the Company's scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Moulder cannot disinterestedly consider a demand to take action against himself and the other Director-Defendants for awarding excessive compensation, as he is a recipient of the benefits of such compensation. Moreover, Defendant Moulder is a defendant in the Securities Class Action. Defendant Moulder signed or personally made many of the false statements and omissions of material fact that are alleged herein, including in each of the Form 10-Ks and 10-Qs referenced above, which he signed.  For these reasons, too, Defendant Moulder breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Hedley is futile follow. Defendant Hedley is one of the Company's co-founders and a long-time Company director, in addition to serving as the Company's COO and President, and is thus, as the Company admits, a non-independent director. She receives lavish compensation, including over $5 million in 2017. Her large Company stock holding, worth over $237.7 million before the fraud was fully exposed, reveals her interest in keeping the Company's stock price as high as possible. Her insider transaction before the fraud was exposed, which yielded approximately $697,474 in proceeds, demonstrates her motive in facilitating and participating in the fraud. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to

make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Hedley cannot disinterestedly consider a demand to take action against herself and the other Director-Defendants for awarding excessive compensation, as she is a recipient of the benefits of such compensation.  Moreover, Defendant Hedley signed or personally made many of the false statements and omissions of material fact that are alleged herein, including in the 2016 10-K, which she signed. Thus, for these reasons, Defendant Hedley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.    Additional reasons that demand on Defendant Mott is futile follow. Defendant Mott has served as a Company director since 2010, and as Chairman of the Board since 2011. He receives lavish compensation, including $1,096,526 in 2017. His large Company stock holding, worth nearly $1.6 **billion** before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time Company director and Board Chair, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Mott cannot disinterestedly consider a demand to take action against himself and the other Director-Defendants for awarding excessive compensation, as he is a recipient of the benefits of such compensation. Moreover, Defendant Mott also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K.   Thus, for these reasons,

Defendant Mott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.     Additional reasons that demand on Defendant Armitage is futile follow. Defendant Armitage has been a Company director since 2013. He receives lavish compensation, including $1,053,526 in 2017. His large Company stock holding, worth over $9 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. His insider transaction before the fraud was exposed, which yielded nearly $1.2 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Armitage cannot disinterestedly consider a demand to take action against himself and the other Director-Defendants for awarding excessive compensation, as he is a recipient of the benefits of such compensation. Moreover, Defendant Armitage also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K. Thus, for these reasons, Defendant Armitage breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.     Additional reasons that demand on Defendant Alleva is futile follow. Defendant Alleva has been a Company director since 2012 and is Chair of the Audit Committee. He received lavish compensation, including $1,065,526 in 2017. His large Company stock holding, worth over $15.1 million before the fraud was fully exposed, reveals his interest in keeping the Company's

stock price as high as possible. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Alleva cannot disinterestedly consider a demand to take action against himself and the other Director-Defendants for awarding excessive compensation, as he is a recipient of the benefits of such compensation. Moreover, Defendant Alleva also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K. Thus, for these reasons, Defendant Alleva breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Seidenberg is futile follow. Defendant Seidenberg has served as a Company director since 2011 and is a member of the Audit Committee. She receives lavish compensation, including $1,055,526 in 2017. Her large Company stock holding, worth nearly $10.2 million before the fraud was fully exposed, reveals her interest in keeping the Company's stock price as high as possible. As a long-time Company director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Seidenberg cannot disinterestedly consider a demand to take action against herself and the other Director-Defendants for awarding excessive compensation, as she is a recipient of the benefits of such compensation. Moreover, Defendant

Seidenberg also was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the 2016 10-K. Thus, for these reasons, Defendant Seidenberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

164. Additional reasons that demand on Defendant Nicholson is futile follow. Defendant Nicholson has served as a Company director since 2015 and as a member of the Audit Committee. He receives lavish compensation, including $1,055,526 in 2017. His large Company stock holding, worth over $3.3 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Nicholson cannot disinterestedly consider a demand to take action against himself and the other Director-Defendants for awarding excessive compensation, as he is a recipient of the benefits of such compensation. Moreover, Defendant Nicholson also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K. Thus, for these reasons, Defendant Nicholson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165. Additional reasons that demand on Defendant Collier is futile follow. Defendant Collier has served as a Company director since 2014. He receives lavish compensation, including $1,064,026 in 2017. His large Company stock holding, worth over $317.9 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible.

As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Collier cannot disinterestedly consider a demand to take action against himself and the other Director-Defendants for awarding excessive compensation, as he is a recipient of the benefits of such compensation. Moreover, Defendant Collier also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K. Thus, for these reasons, Defendant Collier breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Patel is futile follow. Defendant Patel has served as a Company director since March 2016. She receives lavish compensation, including $1,050,526 in 2017. Her large Company stock holding, worth nearly $1.4 million before the fraud was fully exposed, reveals her interest in keeping the Company's stock price as high as possible. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Waste Misconduct, and award excessive compensation, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Patel cannot disinterestedly consider a demand to take action against herself and the other Director-Defendants for awarding excessive compensation, as she is a recipient of the benefits of such compensation. Moreover, Defendant Patel also was the maker of many of the false statements and omissions of material fact that are alleged herein, as she

signed the 2016 10-K.   Thus, for these reasons, Defendant Patel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

167.   Additional reasons that demand on the Board is futile follow.

168.   The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

169.   Defendants Moulder and Hedley have a longstanding working relationship that spans nearly fifteen years and four corporations. Defendant Moulder was involved with MGI PHARMA from 1999 to January 2008, including as President, CEO, and member of the board. Defendant Hedley was at MGI PHARMA from 2004 to January 2008 in various positions, including senior executive roles including Executive Vice President and Chief Science Officer. In January 2008, Defendants Moulder and Hedley both became part of Eisai Co. Ltd. following that company's acquisition of MGI PHARMA. At Eisai Co. Ltd., Defendant Moulder served as Vice Chairman, and Defendant Hedley served as Executive Vice President. Defendant Moulder moved to Abraxis BioScience ("Abraxis") in April 2009, where he was President, CEO and Vice Chair of the Board. Defendant Hedley joined Abraxis months later, in July 2009, serving as Executive Vice President and Chief Science Officer. In early 2010, Defendants Moulder and Hedley left Abraxis to found TESARO. As a result of this long-term personal and professional relationship, and in light of the substantial likelihood of liability that Defendant Moulder faces in the Securities

Class Action, Defendants Moulder and Hedley are unable to evaluate demand with disinterestedness and independence and therefore demand is excused as to these directors.

170.     Defendants Mott and Patel are both partners at New Enterprise Associates in the Washington, D.C. office. Defendant Mott is a General Partner, and Defendant Patel has been a Venture Partner on the healthcare team since November 2017. Defendant Patel is thus beholden to Defendant Mott, and unable to evaluate a demand with independence.

171.     Defendants Mott, Seidenberg, and Patel are associated with venture capital firms that have significant investments in TESARO. Venture capitalists compete to fund entrepreneurs, and future investment opportunities for these directors and their firms may be chilled if any them were to grant a demand. Such effects are especially acute for these Defendants, as each focuses their venture capital practices in the healthcare sector, a field heavily populated by repeat players, a trend evidenced by the fact that a number of Company directors are members of multiple boards in the healthcare sector. New Enterprise Associates, where Defendants Mott and Patel are Partners, invests heavily in the biopharma industry. Defendant Seidenberg, an M.D., focuses on investing in digital health and biotech companies at Kleiner Perkins. Thus, none of these directors can consider a demand with independence or disinterest.

172.     Defendants Mott, Armitage, and Collier are members of the Compensation Committee.  The Compensation Committee provides recommendations to the Board concerning compensation and is responsible for overseeing the management of risks related to the compensation of the Board.  As members of the Compensation Committee, Defendants Mott, Armitage, and Collier face a substantial likelihood of liability for the excessive compensation improperly awarded to themselves and the remaining Director-Defendants.  Thus, they cannot consider a demand with independence or disinterest.

173. Moreover, the Director-Defendants both approved and received the improper compensation and thus stand on both sides of the transactions. As the Director-Defendants hold significantly divergent interests from TESARO stockholders and have derived a personal financial benefit from and had a direct interest in the transactions at issue, they therefore have the burden of proving the entire fairness of their compensation. As the Director-Defendants face a substantial likelihood of liability, there is more than a reasonable doubt that the Board could impartially consider a demand to initiate litigation against themselves, and thus demand is excused.

174. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

175. TESARO has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for TESARO any part of the damages TESARO suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

176.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

177.    The acts complained of herein constitute violations of fiduciary duties owed by TESARO's officers and directors, and these acts are incapable of ratification.

178.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of TESARO. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of TESARO, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

179.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause TESARO to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

180.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

183.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

184.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

185.    Under the direction and watch of the Director-Defendants, the 2017 Proxy Statement failed to disclose that: (1) substantial health risks were associated with VARUBI IV, including anaphylaxis and anaphylactic shock; (2) as a result of the foregoing, the Company would be forced to cease marketing and distribution of VARUBI IV, need to pursue strategic alternatives for the VARUBI brand, and would be forced to write down $18.7 million of VARUBI that the Company was unable to sell; (3) the Company engaged in the Waste Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, TESARO's public statements were materially false and misleading at all relevant times.

186.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

187.    The 2017 Proxy Statement also made reference to the Company's Code of Business Conduct and Ethics. The Code required the Company and Individual Defendants to abide by

relevant laws and statutes, make accurate and non-misleading public disclosures, deal fairly with the public, and not engage in insider trading. By engaging in the Waste Misconduct, issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Business Conduct and Ethics were being violated.

188.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

189.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties for
Failure to Maintain Internal Control and for the Scheme to Make
False and Misleading Statements and Engage in the Waste Misconduct**

190.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

191.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of TESARO's business and affairs.

192.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

193.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of TESARO.

194.    In breach of their fiduciary duties owed to TESARO, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) substantial health risks were associated with VARUBI IV, including anaphylaxis and anaphylactic shock; (2) as a result of the foregoing, the Company would be forced to cease marketing and distribution of VARUBI IV, need to pursue strategic alternatives for the VARUBI brand, and would be forced to write down $18.7 million of VARUBI that the Company was unable to sell; (3) the Company engaged in the Waste Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, TESARO's public statements were materially false and misleading at all relevant times.

195.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

196.    In further breach of their fiduciary duties owed to TESARO, the Individual Defendants willfully or recklessly caused the Company to engage in the Waste Misconduct.

197.    Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, three of the Individual Defendants benefitted themselves by engaging in lucrative insider sales on material inside information.

198.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

199.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of TESARO's securities, and disguising insider transactions.

200.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of TESARO's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

201.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

202.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, TESARO has sustained and continues to sustain significant damages.

203.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

204.    Plaintiff on behalf of TESARO has no adequate remedy at law.

### THIRD CLAIM

**Against Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson,  Oronsky, Patel, and Seidenberg for Breach of Fiduciary Duties for Causing the Company to Award Themselves Excessive Compensation**

205.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.    Defendants Moulder, Hedley, Alleva, Armitage, Collier, Mott, Nicholson, Oronsky, Patel, and Seidenberg breached their fiduciary duties by improperly awarding themselves excessive compensation, thereby wasting corporate assets.

207.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

208.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, TESARO has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff on behalf of TESARO has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, TESARO.

212.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from TESARO that was tied to the performance or artificially inflated valuation of TESARO, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received excessive compensation.

213.    Plaintiff, as a shareholder and a representative of TESARO, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

214.    Plaintiff on behalf of TESARO has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    As a result of the foregoing, the Company incurred a $18.7 million write down as a component of product sales due to the overproduction of VARUBI.

217.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

218.    Plaintiff on behalf of TESARO has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of TESARO, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to TESARO;

(c)     Determining and awarding to TESARO the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing TESARO and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect TESARO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of TESARO to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding TESARO restitution from Individual Defendants, and each of

them;

        (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: May 19, 2018

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*